1  KATHRYN LEE BOYD, ESQ. (SBN 189496)
       (lboyd@srbr-law.com)
2  RAJIKA L. SHAH, ESQ. (SBN 232994)
       (rshah@srbr-law.com)
3  KRISTEN L. NELSON, ESQ. (SBN 269318)
       (knelson@srbr-law.com)
4  **SCHWARCZ, RIMBERG, BOYD & RADER, LLP**
   6310 San Vicente Boulevard, Suite 360
5  Los Angeles, California 90048
   Phone: (323) 302-9488
6  Fax: (323) 931-4990

7  VARTKES YEGHIAYAN, ESQ. (SBN 41773)
       (vartkesy@sbcglobal.net)
8  **YEGHIAYAN LAW FIRM, P.C.**
   535 N. Brand Boulevard, Suite 270
9  Glendale, California  91203
   Phone: (818) 242-7400
10 Fax: (818) 242-0114

FILED
CLERK, U.S. DISTRICT COURT

FEB 26 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

11  Attorneys for PLAINTIFF

12

13             **UNITED STATES DISTRICT COURT**
           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14  Norman MANOOKIAN,                   )   **CV13-01401-SJO**
15                    Plaintiff,        )                    (SHx)
16                                      )   **COMPLAINT FOR**
       vs.                             )   **1. UNLAWFUL**
17                                      )   **EXPROPRIATION;**
18  REPUBLIC OF TURKEY; CENTRAL        )   **2. UNJUST ENRICHMENT;**
    BANK OF THE REPUBLIC OF            )   **3. VIOLATION OF CAL.** *CIVIL*
19  TURKEY; T.C. ZIRAAT BANKASI;       )   *CODE* § **1708;**
20  DOES 1-100,                        )   **4. CONSTRUCTIVE TRUST;**
                     Defendants.        )   **5. ACCOUNTING;**
21                                      )   **6. DECLARATORY RELIEF;**
22                                      )
23  _____)   **DEMAND FOR JURY TRIAL**

24

25

26

27

28

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

MANOOKIAN v. REP. OF TURKEY ET AL.
COMPLAINT

Norman MANOOKIAN ("Plaintiff"), on information and belief, hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is an action seeking fair market rents and other relief for Plaintiff, the rightful owner and the heir of substantial acreage and fixed structures, including a family mansion converted into a museum by the Turkish Ministry of Culture located in the Aintab region of Turkey. Plaintiff's real property assets were unlawfully taken from his family's ownership or control by theft, forced transfer, or exploitation during the Armenian Genocide of 1915-23 which was perpetrated by the Ottoman Turkish Empire, to which the Republic of Turkey ("Turkey") is a successor state.

2.      Plaintiff Manookian is the lawful heir of an Armenian landowner who owned real property and other assets in the Aintab region of Turkey, approximately 400 miles southeast of Ankara. Aintab (modern-day Gaziantep) was a medium-sized town whose history dated back to the period of antiquity. The Armenian population of Aintab established its roots during the Middle Ages during a time of major political upheavals in Armenia proper. Over the next several centuries the community grew due to subsequent waves of migration such that by the eighteenth century all the villages in the Aintab region were Armenian inhabited. Largely skilled in jewelry design, cotton production, and the weaving of carpets and embroidery, the Armenians' physical and cultural presence in Aintab was reflected in their numerous churches, schools, academies and a theological seminary.

3.      Between 1915 and 1923, as part of the Armenian Genocide that took place in the Ottoman Turkish Empire, these Armenian landowners in Aintab were murdered or deported or were forced to flee the country.  The Armenians of Aintab were deported by the Ottoman government to the deserts of Syria. A handful of survivors returned to rebuild their lives after war's end but, after making a yearlong stand against the forces led by future Turkish president Mustafa Kemal, were finally

1  driven out of their homeland in 1921. The genocide survivors, known today as the

2  Armenian Diaspora, ultimately settled all around the world, including in the United

3  States. One of the largest communities of survivors is located within this Judicial

4  District, with the largest concentration in the cities of Glendale and the East

5  Hollywood area of Los Angeles.

6  4.      Beginning in 1915, the government of the Ottoman Turkish Empire began

7  ordering the collection of real and personal property and deportation of Turkish

8  Armenians.  A series of discriminatory regulations, directives, and decrees issued

9  by the Ottoman Turkish Empire between 1915 and 1923, collectively known as the

10  "Abandoned Property Laws", sought to provide legal cover for the unlawful

11  expropriation of the property and assets of Turkish Armenians, including that of

12  Plaintiffs.  For example, Article 2 of the May 16, 1915, Regulation on the

13  Confiscation and Redistribution of the Armenians' Goods Said "Abandoned" By

14  the Ministry of the Interior ("May 16, 1915 Regulation") provides that "After a

15  village or a city are deported, the houses and all real properties belonging to the

16  deported population, including the items they contain, shall be closed and

17  immediately put under seal by the employees authorized by the Administrative

18  Commissions and shall then be taken under protection." A true and correct copy of

19  the May 16, 1915 Regulation is attached as Exhibit A to this Complaint.

20  5.      In response to the outrage expressed by the international community over the

21  large-scale deportations, murders, and expropriation of property from Turkish

22  Armenians by the Ottoman Turkish government, government telegrams posted in

23  1916 demonstrate that proceeds from the sale of properties left behind by deportees

24  were deposited with Defendant T.C. Ziraat Bankasi ("Ziraat Bank") – which was

25  founded by the Ottoman state in 1863 as an agricultural financial institution and is

26  operated with a state guarantee – and upon information and belief were held in trust

27  and for safekeeping on behalf of the rightful Armenian owners in accordance with

28  other Abandoned Property Laws. *See, e.g.,* Telegrams from the Directorate of

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1    Ottoman Prime Ministry Archives, Code numbers 272.0.0.12 relating to "Tasfiye

2    Komisyons"; 272.0.0.74 relating to Konya; 272.0.0.74 relating to Bursa; 272.0.0.74

3    relating to Afyon (Karahisar); 272.0.0.74 relating to Sivrihisar; 272.0.0.74 relating

4    to Sivas; 272.0.0.74 relating to Yozgat; 272.0.0.74 relating to Izmit; *see also* Prime

5    Ministry Directorate of Dissemination of Decisions, Decision No. 2/11873. True

6    and correct copies of the Telegrams and Decision 2/11873 are attached as <u>Exhibit B</u>

7    to this Complaint.

8    6.      In 1923, Turkey became the successor state to the Ottoman Turkish Empire.

9    7.      In 1928, new laws came into effect transferring all "abandoned" real and

10   personal property to the Turkish Treasury. Since its establishment in 1856, the

11   Imperial Ottoman Bank acted as the state Treasurer and was responsible for

12   collecting state revenues. Defendant Central Bank of the Republic of Turkey

13   ("Turkish Central Bank") was established in its present format in 1931 as the

14   successor to the Imperial Ottoman Bank. Today, one of the primary duties of the

15   Turkish Central Bank is its execution of Treasury operations.

16   8.      As a result, Plaintiff's property not sold by the Ottoman Turkish Empire or

17   Turkey is currently in the possession and use of Defendant Turkey.

18   9.      Plaintiff alleges that Defendant Ziraat Bank profited from its possession of

19   his property between 1915 and 1928, including but not limited to the lease and/or

20   sale of the property or other commercial banking activities based on Plaintiff's

21   property, and that Ziraat Bank is still in possession of those profits. In addition,

22   Ziraat Bank violated its fiduciary duties to Plaintiff as holder of property on his

23   behalf.

24   10.     Plaintiff additionally alleges that, since at least 1928, Plaintiff's real property

25   and assets in Aintab that were not sold have been continuously wrongfully owned

26   and controlled by the Turkish government and used for commercial activities by

27   Turkey and the Turkish Central Bank in conjunction with numerous private

28   commercial enterprises operating both in the United States and elsewhere. Income

- 3 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

MANOOKIAN v. REP. OF TURKEY ET AL.
COMPLAINT

1   earned from those properties, including income from ticket sales from Turkish and

2   foreign tourists – including Americans – to the Hasan Süzer Ethnography Museum,

3   flows continuously into the Turkish Central Bank. Thus, Defendants Turkey and

4   the Turkish Central Bank are profiting from and being unjustly enriched by their

5   possession of and /or use of proceeds from such stolen property belonging to

6   Plaintiff.

7   11.   International law forbids the taking of property of a state's own nationals

8   when such taking is based on racial, ethnic, or religious grounds, and arises out of a

9   genocide of the kind perpetrated against the Jews of Europe or the Armenians in

10   Ottoman Turkey.

11   12.   Defendants, despite knowing, or reasonably having reasons to know, that

12   Plaintiff's properties in Aintab were unlawfully taken from Armenians pursuant to a

13   campaign of genocide against them based on ethnic and religious grounds, have

14   nevertheless engaged, and continue to engage, in commercial activities using such

15   genocide-taken properties and/or proceeds from the possession or sale of such

16   properties.

17   13.   In summary, Defendants Ziraat Bank, Turkey, and the Turkish Central Bank

18   have been profiting, and continue to unjustly profit, from the possession and

19   commercial use of Plaintiff's property and/or its proceeds, and all such unlawful

20   profits have a commercial nexus with the United States. Plaintiff brings this action

21   against Defendants who have been unjustly enriched by their continuing possession

22   and use of proceeds from stolen real property arising out of a genocide that rightly

23   belongs to Plaintiff.

24

25   **PARTIES**

26   14.   Plaintiff Norman Manookian is a United States citizen and resident of

27   Brentwood, Tennessee, and lawful heir of his grandfather Garouj Karamanoukian, a

28   well-known wealthy businessman and philanthropist from the Aintab region of the

- 4 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

MANOOKIAN v. REP. OF TURKEY ET AL.,
COMPLAINT

Ottoman Empire, which is now modern-day Turkey. Plaintiff brings this action to preserve the memory of his brave and accomplished grandfather. Garouj Karamanoukian was born on or about 1855 in Aintab. Karamanoukian was the owner of at least five (5) large properties in or around Aintab described as **Property 1** consisting of large orchards (including both fruit and pistachio trees); **Property 2** consisting of portions of villages purchased at the beginning of the twentieth century; **Property 3**, a building used as a store selling furniture and clothing; **Property 4,** a lace manufacturing business; and **Property 5,** the family mansion built at the beginning of the twentieth century on Kayajig (or "Little Rock Hill"), which currently houses the Hasan Süzer Ethnographic  Museum.

15.    By the late nineteenth century Garouj Karamanoukian was a well-established clothing and furniture merchant with a store in Aintab.

16.    Following unrest in Aintab in 1895 between Armenians and Turks, Karamanoukian sent his eldest son Moses – Plaintiff's father – to the United States to establish a family business. A true and correct copy of a photograph of Moses Karamanoukian taken on or about 1908 is attached hereto as <u>Exhibit C</u> to this Complaint.

17.    Each month Karamanoukian sent Moses lace and needlework handkerchiefs, doilies and tablecovers made by the women of Aintab. The delicate handiwork of Armenian women in Aintab was exceptionally popular in the United States and the family business thrived. Karamanoukian was able to employ hundreds of women in Aintab to assist in the making of the lace and needlework. A true and correct copy of a photograph of Garouj Karamanoukian inspecting his business' lacework before it was exported is attached hereto as <u>Exhibit D</u> to this Complaint.

18.    With the money Karamanoukian received from the sale of the lace and needlework in the United States, he purchased real property including, orchards and parts of villages around Aintab, described herein as **Property 1** and **2**. Karamanoukian planted pistachio trees on many of the fields and exported the nuts

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

to the United States. He also exported Turkish and Persian carpets to the United States.

19.     At the beginning of the twentieth century, Karamanoukian built a luxurious three-story mansion situated on Hanifioglu Street with a cellar for his family with twelve rooms, a courtyard and trees and flowers surrounding it. The mansion was located in an area of Aintab where many other intellectual and wealthy families built homes. There was a staircase from the ground to the middle floor of the mansion and all-around verandas facing the inner courtyard. There was a hall with two angel heads carved on each side of a marble hand washbasin and a tiled floor. Inside the miniature palace was a large sitting room and another huge parlour with rich carpets, rocking chairs and a huge built-in settee with soft mattresses and cushions for back support. Three windows overlooked the courtyard and one window overlooked the street above the large ground floor entrance door. The design of the house was created in Beirut, Lebanon and included many unique features such as a glass and timber partition that divided the dining room and parlour, as well as a courtyard with a colored-stone pavement.

20.     The family mansion is owned by the Turkish Ministry of Culture and Tourism and is currently being used as the Hasan Süzer Ethnographic Museum (the "Museum"). True and correct copies of the Karamanoukian family standing in front of their Aintab mansion on or about 1908 – **Property 5 -** are attached hereto as Exhibit E to this Compaint. For comparison, a copy of a current photograph of the Museum from the tourist website, "Gaziantep City", (http://www.gaziantepcity.info/en/hasan_ suzer_ethnography_museum) is attached hereto as Exhibit F to this Complaint. There is no mistaking that the buildings are one and the same.

21.     Between 1914 and 1918 Garouj Karamanoukian and eighteen (18) of his immediate and extended family members were driven from their homes in the Aintab region and deported to Deir ez-Zor in what is modern-day Syria. During this

- 6 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

MANOOKIAN v. REP. OF TURKEY ET AL.
COMPLAINT

period, sixteen (16) of his eighteen (18) family members including himself and his wife were massacred. Plaintiff Norman Manookian's father, Moses, survived the genocide because he had been living in the United States since the late nineteenth century.

22.     Plaintiff is unaware of any other members of Garouj Karamanoukian's extended family that have attempted to file a claim for the return of property described as **Properties 1, 2, 3, 4** and **5** in this Complaint. As descendants of victims of the genocide, Plaintiff's family members that survived the massacre would not speak in detail about the horrific events and thus until recently Plaintiff never knew the full history of his grandfather, that many of his grandfather Moses' siblings were massacred and the extent of Karamanoukian's properties in Aintab.

23.     Defendant Republic of Turkey, as successor to the Ottoman Turkish Empire, currently operates numerous state-owned commercial enterprises in the United States, including business within this Judicial District.  For example, Turkish Airlines, a state economic enterprise, has been operating services into the United States since 1988 and announced in July 2010 that Los Angeles is its "West Coast gateway" and that it will begin running nonstop service from Los Angeles International Airport to Turkey in early 2011.  Additionally, the Turkish Culture and Tourism Office, a division of the Ministry of Tourism, operates a Tourism Information Office in Los Angeles and advertises throughout the United States for travel to Turkey.

24.     The Turkish Central Bank is an agency or instrumentality of Turkey with its principal place of business in Ankara, Turkey. The law creating the Turkish Central Bank was passed in 1930; prior to that time, the Imperial Ottoman Bank acted as the Treasurer of the state, collecting state revenues and making payments. According to the 1930 Law on the Central Bank of the Republic of Turkey No. 1715, one of the duties of the Central Bank was to execute Treasury operations, and according to the 1986 amended Article 41 of the Law on the Central Bank of the

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

Republic of Turkey No. 1211, "The [Central] Bank shall be the treasurer of the government." (http://www.tcmb.gov.tr/yeni/eng/, "History" and "CBRT Law"). Defendant Turkish Central Bank is a joint-stock company with the majority of shares belonging to the Turkish Treasury. It operates a representative office in New York, from which it coordinates investment and commercial activity throughout the United States. The Turkish Central Bank also distributes state funds to government entities, including the Ministry of Tourism. Defendant Turkish Central Bank does extensive business in the United States, including business within this Judicial District.

25.    Plaintiff is informed and believes and thereon alleges that Ziraat Bank is an agency or instrumentality of Turkey with its principal place of business in Ankara, Turkey. Ziraat Bank operates U.S. correspondent banking services and offers retail banking to its U.S. customers. Any individual may apply for and open an account with the Ziraat Bank U.S. branch in New York. According to the Ziraat Bank website, the U.S. branch "was established in 1983 with the purpose of enhancing financial services for the Turkish community in the United States." (www.ziraatnewyork.com). On its website, Defendant Ziraat Bank makes available applications for standby and import letters of credit, which are aimed at soliciting business from U.S. corporate banking customers and which can be accessed on the Internet in Los Angeles, California. Defendant Ziraat Bank does extensive business in the United States, including business within this Judicial District.

26.    As a result of their possession and use of Plaintiff's property, the proceeds from rent collected and/or the sale of Plaintiff's property, and their business and other commercial relationships, including parents, affiliates, and subsidiaries, Defendants Turkey and the Turkish Central Bank have been unjustly enriched by the unlawful expropriation and use of Plaintiff's property. As a result of Defendant Ziraat Bank's possession and/or use of Plaintiff's property from 1914-1928, and its business and other commercial relationships, including parents, affiliates, and

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

1    subsidiaries, Ziraat Bank has been unjustly enriched by the unlawful expropriation
2    and use of Plaintiff's property.

3    27.    Plaintiff is informed and believes and thereon alleges that there are other
4    Defendants holding proceeds derived from or benefiting from the expropriation and
5    use of Plaintiffs' property.  The true names and capacities of Defendants named
6    herein as DOES 1 through 50, inclusive, whether individual, corporate, associate, or
7    otherwise, are unknown to Plaintiff, who therefore sues such Defendants by such
8    fictitious names.  Each of the Defendants designated herein as DOE is negligently
9    or otherwise legally responsible in some manner for the events and happenings
10   herein referred to and caused injuries and damages proximately thereby to Plaintiff,
11   as herein alleged.  Plaintiff will amend this Complaint to show true names and
12   capacities when they have been ascertained.

13

14                                  **JURISDICTION AND VENUE**

15   28.    This Court has subject matter and personal jurisdiction over Defendants
16   Turkey, the Turkish Central Bank, and Ziraat Bank pursuant to 28 U.S.C. § 1330
17   and §§ 1604 and 1605 of the Foreign Sovereign Immunities Act ("FSIA").
18   Defendants Turkey, the Turkish Central Bank, and Ziraat Bank are not entitled to
19   sovereign immunity in this suit pursuant to the sovereign immunity exceptions
20   found in 28 U.S.C. § 1605(a)(2) and (3) of the FSIA. Defendants have purposely
21   availed themselves of this forum.

22   29.    Plaintiff's action is based upon the commercial activities carried out by
23   Defendants Turkey, the Turkish Central Bank, and Ziraat Bank and DOES 1-50 in
24   connection with Plaintiff's property. Plaintiff is informed and believes and thereon
25   alleges that Defendants Turkey, the Turkish Central Bank, and Ziraat Bank and
26   DOES 1-50 are aware, or with reasonable diligence should have been aware, that
27   they are engaging in commercial activities both inside and outside the United
28   States, in connection with commercial activity carried on by Defendants in Turkey,

- 9 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

MANOOKIAN v. REP. OF TURKEY ET AL.
COMPLAINT

and that their acts cause a direct effect in the United States. Defendants thereby have unjustly profited and continue to unjustly profit from the unlawful use and possession of Plaintiff's property.

30.     Plaintiff's property in Turkey is occupied in whole or in part by the Museum. The Museum is owned by the Turkish Ministry of Culture and Tourism. On information and belief, since the 1980s, the Museum has catered to visitors from around the world – including the United States who pay for tickets via cash or credit cards. The popular U.S. travel guidebook company "Lonely Planet" describes the Museum as "well worth a visit." *See* http://www.lonelyplanet.com/turkey/ central-anatolia/gaziantep-antep/sights/ museum/hasan-suzer-ethnography.

31.     Defendants Turkey and the Turkish Central Bank are therefore receiving profits and benefits directly from U.S. sources which are generated by their commercial use of Plaintiff's property.

32.     Defendant Ziraat Bank engaged in regular commercial banking activities involving Plaintiff's property during the entire period it held such property pursuant to the Abandoned Property Laws. Plaintiff is informed and believes and thereon alleges that the proceeds from such activities became commingled with general bank funds and thus continue to form part of Ziraat Bank's stream of revenue and proceeds.

33.     The expropriation of Plaintiff's property in Turkey has resulted in a windfall to Defendants through the commercial activities of leasing, issuing mortgages on or otherwise using the land as collateral, and/or selling the land. As the rightful owner of the land, Plaintiff is suffering harm from the loss of use and proceeds from his property. Defendants Turkey and the Turkish Central Bank's continued unlawful use of the property causes a direct effect in the United States because a U.S. visitors and tourists use their credit cards to pay admission fees to the Museum and take tours on which the Museum property is a highlighted feature. The Museum is also

- 10 -

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

MANOOKIAN v. REP. OF TURKEY ET AL.
COMPLAINT

1   featured on travel websites, such as LonelyPlanet, accessible to potential American

2   travel-goers within the U.S.

3   34.    In addition, Defendant Ziraat Bank uses funds derived from its unlawful acts

4   in carrying out its banking and solicitation activities in the U.S. The expropriation

5   of Plaintiff's property in Turkey has resulted in unjust enrichment of Defendant

6   Ziraat Bank through the commercial activities and benefits associated with the

7   continued retention of proceeds from the initial unlawful sales of Plaintiff's

8   property.

9   35.    Plaintiff's action is additionally based upon their rights in property

10  unlawfully expropriated by Defendant Turkey in violation of international law,

11  pursuant to a Turkish campaign of genocide based on racial, ethnic and religious

12  grounds.  Proceeds from the possession, use, and/or sale of Plaintiff's property are

13  currently present in the United States in connection with Defendants' commercial

14  activities carried on in the United States. Defendants are all currently engaged in

15  commercial activities in the United States.

16  36.    International law prohibits the taking of property when it is done in a

17  discriminatory way or pursuant to gross violations of human rights. Plaintiff's

18  property was taken pursuant to the genocidal campaign of the Ottoman Turkish

19  Empire to destroy, in whole or in part, Armenian Christians in Turkey. The Turkish

20  Armenian population was singled out from other Turkish citizens and was

21  subjected to deportation, abduction, torture, massacre, and starvation. According to

22  the website of the Armenian National Institute (www.armenian-genocide.org), "the

23  great bulk of the Armenian population was forcibly removed from Armenia and

24  Anatolia to Syria, where the vast majority was sent into the desert to die of thirst

25  and hunger. Large numbers of Armenians were methodically massacred throughout

26  the Ottoman Empire. Women and children were abducted and horribly abused. The

27  entire wealth of the Armenian people was expropriated." Approximately 1.5 million

28  people died during the genocide. These acts, which were part of widespread and

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

systematic attacks on the Armenian population, also constituted crimes against humanity. The expropriation of Plaintiff's property pursuant to such acts violated *jus cogens* norms forbidding systematic racial discrimination and genocide and fell entirely on Armenians, and, as such, was unlawful and in violation of international law.

37.    As alleged herein, the property taken from Plaintiff during the Armenian genocide, and the proceeds from such property, are currently held by Defendants. In the first years after the initial taking, Defendant Ziraat Bank was required under the Abandoned Property Laws to hold the property or proceeds from property of Armenians in trust on behalf of the rightful owners. In 1928, new Turkish laws authorized Defendant Ziraat Bank to turn over to the Treasury all the Armenian property it held.  Plaintiff believes that his property was not held in the name of the rightful Armenian owners, and thus has been commingled with other property of Defendants. Additionally, some or all of the property itself has been sold and/or leased and in the specific case of the Museum, the property was sold and then donated back the Ministry of Culture and Tourism. Proceeds from the lease and sale of Plaintiff's land are held by Defendants Turkey and the Turkish Central Bank. All three Defendants –Turkey, the Turkish Central Bank, and Ziraat Bank – are currently engaged in commercial activities in the United States using commingled funds from Plaintiff's property.

38.    Venue is proper within this Court because Defendants do business in Los Angeles County and/or because Defendants transact business with consumers who reside in Los Angeles County and the State of California. Venue is also proper because no adequate alternative forum with any remedy exists for Plaintiff's claims, and any claim brought in the Republic of Turkey would be futile.

///

///

///

- 12 -

## FACTS COMMON TO ALL COUNTS

39.     In the late nineteenth and early twentieth centuries many ethnic Armenians living in the Ottoman Turkish Empire enjoyed prosperity. Many Armenians owned real property and other assets within and around the region of Aintab. From the Middle Ages Aintab experienced large waves of Armenian migration such that by the eighteenth century, Armenian inhabited all the villages in the Aintab region.

40.     In approximately 1910, shortly after having gained power, a regime in the Ottoman Turkish Empire known as the "Young Turks," along with a clique of officers and technicians, secretly began to plan for the cleansing of all non-Turks, including ethnic Armenians, from the Ottoman Turkish Empire.

41.     The Young Turks resolved to "deport and relocate" Armenians away from population centers and into the deserts of Syria, then part of the Ottoman Turkish Empire. By 1915, the "relocation" of Armenians served as a ruse for the genocide. Using the fighting and bloodshed from the battles of World War I as a cover, the government of the Ottoman Turkish Empire launched a systematic campaign to destroy ethnic Armenians through a process of massacre and deportation, which is now recognized as the Armenian Genocide.  As a result of this premeditated state-sponsored campaign of genocide between 1915 and 1923, the ethnic Armenian population of Ottoman Turkey was annihilated and only a small number survived to reach Syria and elsewhere.

42.     As part of this genocidal campaign, the Young Turks instigated the systematic transfer of Turkish Armenian-owned businesses, factories, shops, farms, and all other economic enterprises into Turkish Muslim ownership.  In May 1915, the Young Turks issued a regulation stating that all real property belonging to Armenians was to be considered abandoned property.  Further, on November 24, 1915, the Minister of the Interior sent an encrypted message to the Commission of Clearance and Settlement of the province of Aleppo – which included Aintab – among others, where he "ordered that special companies be formed for the real and

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

temporal Armenian properties left behind by the deportees in order to give their ownership to Muslims under color of law." A true and correct copy of the November 24, 1915 encrypted message is attached as <u>Exhibit G</u> to this Complaint.

43.    A circular letter dated January 11, 1916, from the Turkish Minister of Commerce and Agriculture, Director-General of Commerce, specified 31 localities throughout Turkey where Armenians resided and directed that all Armenian assets in those localities were to be catalogued and administered by "Liquidation Commissions" (Turkish Commissionou). In fact, the Liquidation Commissions provided legal cover to give Turkish Muslims properties far below market rates, assign immigrants to live in former Armenian houses, take over Armenian factories, distribute Armenian crops to the military, and even use proceeds derived from the sale of Armenian property to fund their deportation.

44.    Among the real property and other assets expropriated by the Ottoman Turkish Empire as part of these Liquidation Commissions was Plaintiff's property in Aintab.  Plaintiff's family members were landowners of properties situated in the Aintab region of Turkey.  The properties were confiscated by the Turkish government after the family was removed from their home. The expropriation of Plaintiff's property occurred between 1914 and 1918 when Norman's grandfather and most of his extended family were either murdered or forced to flee to Deir ez-Zor, Syria.

45.    After World War I, resolutions were passed facially permitting Armenians to return to Turkey, but the government actively blocked Armenian efforts to reclaim the property that was allegedly held in trust on their behalf.  Most were not able to return to their original homes.  Turkey also treated Armenians as non-citizens, sending them out of the country and prohibiting their return by stamping their passports "Return interdit" (return prohibited). A true and correct copy of a cancelled Armenian passport is attached as <u>Exhibit H</u> to this Complaint.

SCHWARCZ, RIMBERG,
BOYD & RADER, LLP
6310 San Vicente Blvd
Los Angeles, CA 90048

46.     By 1921, the newly established nationalist government in Ankara was looking to complete the vision of the Young Turks to expel the Armenians. Armenians that returned were quickly run out of the country again.  Without the protection of foreign or Allied powers, it was impossible for Armenians to try to reclaim their homes and property.

47.     In 1923, Turkey became the successor state of the Ottoman Turkish Empire.

48.     From the time Plaintiff's property was expropriated until the present the property has been designated by Turkey as state-owned property, and leased and/or sold. The property and proceeds derived from the property were deposited first with Defendant Ziraat Bank, which continues to benefit from the proceeds it earned during the time of its possession, then turned over to Defendants Turkey and the Turkish Central Bank, who continue to possess Plaintiff's property and/or the proceeds derived from the use and possession of such property.

49.     Restitution of the property is Plaintiffs' rightful remedy in international law for an unlawful taking. In lieu of restitution, Plaintiffs are entitled to damages, including replacement value. Plaintiff's property includes substantial acreage and fixed structures such as houses and parts of villages, a building used as a store, a lace manufacturing business, as well as the mansion which is currently home to the Museum.  The value of Plaintiff's property is in excess of the jurisdictional minimum and will be determined according to proof at trial.

50.     The facts and substance of this claim are not governed by any superseding international agreement or treaty between Turkey and the United States.

51.     Plaintiff has no legal remedy or judicial forum within the Turkish legal system. Laws passed in 1928 and 1929 formally ended Turkey's disingenuous attempt at the restitution of immovable property to its rightful Armenian owners, and any funds transferred to the Treasury in relation to immovable property were recorded as revenue in the state budget. Only the value of the property as assessed

- 15 -

in 1915 would be paid to verified landowners. Turkish courts have consistently ruled in favor of Turkey in quiet title actions involving former Armenian property.

## LEGAL AND EQUITABLE TOLLING

52.     No statute of limitations has begun to run on the Defendants' actions or on the Plaintiff's legal right to seek compensation for properties taken as a result of the Armenian Genocide.

53.     Plaintiff's claims are equitably tolled due to the extraordinary circumstances outside of their control that has made bringing suit for recovery of unlawfully expropriated property impossible until now.  During and after World War I, the Plaintiff's family was forced to flee the Ottoman Turkish Empire – modern-day Turkey – leaving behind murdered family members and all of their movable and immovable property.  The Abandoned Property Laws enacted by the Turkish government had the cumulative effect of preventing the return of Armenians as well as preventing any claim for compensation for the unlawful expropriation.  In the decades following the genocide, the surviving Armenians were scattered throughout the world as refugees.  Given the loss of home, family, belongings, and resources as a result of the genocide, and the hostile political and legal climate for Armenians in Turkey, it was impossible for Plaintiff's predecessors to seek compensation for their stolen property or focus on anything but rebuilding their lives.  Therefore, the extraordinary circumstances associated with being diaspora heirs of Armenian Genocide survivors equitably tolls the statute of limitations for Plaintiff's claims.

## FIRST CAUSE OF ACTION
### UNLAWFUL EXPROPRIATION

54.     Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in paragraphs 1 through 53 above.

- 16 -

MANOOKIAN v. REP. OF TURKEY ET AL.
COMPLAINT

55.     Plaintiff is informed, believes and thereon alleges that Defendants, prior to the commencement of this action, wrongfully expropriated Plaintiff's property with the knowledge of Plaintiff's lawful claim of ownership over the property in violation of international law. An expropriation is only valid when it serves a public purpose, when aliens are not discriminated against or singled out for regulation by the state, and when just compensation is paid. For Plaintiff, the unlawful expropriation was made pursuant to a state-sponsored campaign of genocide, the purpose of which was to exterminate in substantial part Armenians living in Ottoman Turkey and to drive those that did not perish out of Turkey, as part of a campaign to create an ethnically pure Turkish state. Such genocidal acts are violations of *jus cogens* norms, which are universally accepted and are non-derogable.

56.     Defendants continue to wrongfully and knowingly use, profit from, transfer, convey, improve upon, and acquire Plaintiff's property acquired through the genocide in a manner which is adverse and inconsistent with Plaintiff's lawful rights of ownership.

57.     Any demand made by Plaintiff for return, possession, restitution, and compensation would be futile, since Turkish law and Turkish government policy prevents heirs of Armenian genocide victims from obtaining the return of their properties.

58.     As a result of Defendants' unlawful expropriation of the Plaintiff's property, Plaintiff is entitled to recovery of the current fair market replacement value of the properties plus the accrued reasonable rental value.

## SECOND CAUSE OF ACTION
### RESTITUTION FOR UNJUST ENRICHMENT

59.     Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in paragraphs 1 through 58 above.

- 17 -

60.    As alleged herein, Defendants have received the benefits of Plaintiff's property and assets as set forth above.

61.    Defendants have been unjustly enriched, and further, it would be inequitable for Defendants to be allowed to retain the proceeds from the use of Plaintiff's assets and property without being ordered to disgorge the profits from the use of those assets and property.

### THIRD CAUSE OF ACTION
### VIOLATION OF CALIFORNIA *CIVIL CODE* § 1708

62.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in paragraphs 1 through 51 above.

63.    Defendants violated California *Civil Code* § 1708, which states: "Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights."

64.    As a direct and legal cause of Defendants' violation of *Civil Code* §1708, Defendants have been unjustly enriched at Plaintiff's expense and have caused Plaintiff to incur damages and injuries to his rights and property resulting from Defendants' wrongful conversion and use of Plaintiff's property.  Accordingly, Plaintiff seeks all legal and equitable remedies to compensate him for Defendants' violation of *Civil Code* § 1708, including without limitation actual damages and/or restitution.

### FOURTH CAUSE OF ACTION
### CONSTRUCTIVE TRUST

65.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in paragraphs 1 through 64 above.

66.    Plaintiff is informed and believes that Defendants have taken title and/or come into possession of various assets which belonged to Plaintiff.  As a result of

- 18 -

1  Defendants' acquisition, control and use of Plaintiff's property, without Plaintiff's

2  consent, Defendants have been unjustly enriched as alleged herein.

3  67.   As a result of Defendants' unjust enrichment arising from its use and

4  possession of Plaintiff's property described herein, a Constructive Trust exists

5  wherein Defendants are the constructive trustees of all property and assets

6  belonging to Plaintiff and Defendants are therefore under a duty to convey said

7  property to Plaintiff as the beneficiary of the constructive trust.  Accordingly, a

8  Constructive Trust exists as to all of Plaintiff's property.

9

10  **FIFTH CAUSE OF ACTION**

11  **ACCOUNTING**

12  68.   Plaintiff realleges and incorporates by reference, as though fully set forth

13  herein, each and every allegation set forth in paragraphs 1 through 67 above.

14  69.   Plaintiff is informed and believes and thereon alleges that Defendants have

15  wrongfully taken title and/or possession to certain assets and property belonging to

16  Plaintiff and have been unjustly enriched as alleged herein.  Plaintiff's property

17  includes substantial acreage and fixed structures such as houses and parts of

18  villages, a building used as a store, a lace manufacturing business, as well as the

19  mansion which is currently home to the Hasan Süzer Ethnography Museum.  Due

20  to the complicated nature of Defendants' accounts and businesses, which are known

21  to Defendants and unknown to Plaintiff, and to avoid manifest injustice by

22  preventing Plaintiff from recouping those profits unlawfully converted by

23  Defendants, Plaintiff is entitled to an accounting to determine the amount of

24  restitution and/or damages owed to Plaintiff by Defendants.

25  70.   The exact nature and extent of the assets and property of the Plaintiff and the

26  amounts which are due to Plaintiff cannot be ascertained without an accounting of

27  all records, books, and accounts regarding all of the Plaintiff's property and the

28

- 19 -

1    profits obtained by Defendants from their use and conversion of Plaintiff's

2    property.

3

4                     **SIXTH CAUSE OF ACTION**

5                     **DECLARATORY RELIEF**

6    71.    Plaintiff realleges and incorporates by reference, as though fully set forth

7    herein, each and every allegation set forth in paragraphs 1 through 70 above.

8    72.    There is a real dispute between the parties as to whether Defendants are

9    unjustly profiting from property belonging to Plaintiff and as to the amount of the

10    unjust enrichment and the nature and value of the assets and property belonging to

11    the Plaintiff. Consequently, Plaintiff seeks a judicial declaration that they are the

12    owners of certain real property and other assets, the proceeds of which are presently

13    in Defendants' use, possession, and/or control and that Plaintiff is entitled to

14    restitution based on Defendants' unjust enrichment and profits arising from

15    Defendants' use, possession, and/or expropriation of Plaintiff's property.

16

17                        **PRAYER**

18        Wherefore, Plaintiff prays for judgment and relief against Defendants as

19    follows:

20    1.    For compensatory and punitive damages in an amount within the

21    jurisdictional limits of this Court according to proof;

22    2.    For the current fair market replacement value of the expropriated property, in

23    an amount to be determined at trial, according to proof;

24    3.    For an accounting of profits, as ordered by this Court;

25    4.    For loss of profits, according to proof;

26    5.    For restitution based on Defendants' unjust enrichment, according to proof;

27    6.    For the imposition of a constructive trust;

28    7.    For declaratory relief as requested herein;

1   8.   For costs of suit;

2   9.   For costs expended by Plaintiff in pursuit of their property pursuant to

3   California *Civil Code* § 3336;

4   10.   For injunctive relief to prevent Defendants' continuing unjust enrichment;

5   and

6   11.   For such other and further relief as the Court may deem just and proper.

7

8                       **DEMAND FOR JURY TRIAL**

9           Plaintiff hereby demands a jury on all issues to which he is entitled to have

10   tried by jury.

11

12   Dated: February 25, 2013               **SCHWARCZ, RIMBERG, BOYD &**
                                            **RADER, LLP**
13

14

15                                          By:

16                                              K. LEE BOYD
                                                Attorney for Plaintiffs
17

18

19

20

21

22

23

24

25

26

27

28

- 21 -

# EXHIBIT A

**May 16 1915 Regulation on the confiscation and redistribution of the Armenians'
goods said "abandoned" by the Ministry of the Interior (34 articles).**

Article 1.        "The commissions on abandoned goods constituted under the above-mentioned
articles shall act according to the instructions pertaining to properties and real properties
abandoned by the deported Armenians."

Article 2        "After a village or a city are deported, the houses and all real properties
belonging to the deported population, including the items they contain, shall be closed
and immediately put under seal by the employees authorized by the Administrative
Commissions and shall then be taken under protection."

Article 3        "The quality, the quantity and the estimated price of the items taken under
protection as well as the names of their owners shall be inscribed in details in a registrar,
then the things shall be transported to church, to school, to Khan and in the warehouses,
and will be preserved separately in such a way that the owner of each item will not be
confused. A report shall be written about the owners as well as the goods to verify their
origin and destination. The original of this report must be given to the local authorities
and the exact certified copy to the Administrative Commissions of Abandoned Goods."

Article 5.        "The mobile goods that, with time, deteriorate, or the domesticated animals shall
be sold at public auctions through the mediation of under-commissions designated by the
Commission and the profits shall be remitted to, in deposits, the Treasury of the Ministry
of Finance, in the name of the owners, if they are known, or in the name of the village or
the city where those sales occur if the owners are unknown
The quality, the quantity, the value, the name of the owner, the clients' name, the
purchase price, shall be registered in details in a registrar and approved by the
commission that directed the auctions
A police report shall be prepared and the original submitted to the local government, to
the administrative commission on abandoned goods."

Article 6        "The objects found in churches, the images and sacred books shall be registered
at the registrar. A police report shall be addressed and kept locally. Then, when the
deported population shall be installed in whichever location, the objects having belonged
to each village shall be restored to them."

Article 7        "The quality and quantity of each property and of each abandoned good shall be
registered in a registrar, with their value in the name of the owners and a list of the
abandoned real properties shall be drafted in each village and city and remitted to the
administrative commissions."

Article 8        "In the event perishable harvests and articles of food are found in the properties
and buildings, they shall be sold at public auctions through the means of authorized
persons and the profits made, shall be deposited as consignments at the treasury of the
Ministry of Finance, in the name of the owners, and a police report will be drafted
The original shall be remitted to the local authorities and a copy, to the Administrative
Commission."

Article 9        "In the event where there would be no purchasers for the harvest goods and for
the vine-growing productions, an agreement shall be concluded on the basis of which the
merchandises shall be sold to the claimants by means of adjudication.
The profits hence made by the sale or the rental shall be remitted temporarily to the
treasury of the Ministry of Finances in the name of the owners."

**Exhibit A
22**

Article 10        "No transaction shall take place under power of attorney if the deported
        Armenian owners have given this power of attorney to sell those goods after the date of
        their deportation "

Article 11.        "Turkish Mouhadjirs (refugees) shall be installed in the houses and on the lands
        of the deported Armenians
        Depending on their agricultural abilities a receipt shall be delivered to them "

Article 12        "The registration of the settled Mouhadjirs (refugees) shall be detailed and
        regular  The names, the age, the arrival date of those who receive homes shall be
        transcribed in a registrar  They shall be given a receipt indicating the quantity and size of
        the properties and lands entrusted to them "

Article 13        "The mouhadjirs shall be solely responsible for the protection of the houses and
        trees in the villages, the amount of damages occasioned shall be cashed from the entire
        village population and those who have done these damages shall be estranged and
        deprived of the advantages granted to the mouhadjirs."

Article 14        "After having distributed the houses to the mouhadjirs, the nomad tribes shall be
        housed in the surplus homes and formalities shall be done for them like for the
        mouhadjirs "

Article 15        "While housing the mouhadjirs in the houses of the deported Armenians from
        the cities and villages, priority shall be given to the inhabitants of cities and districts, in
        regards to their economic conditions and their constructive abilities, they shall be given
        lands in sufficient quantity "

Article 16.        "Boutiques, commercial houses, tkhans, public baths, consignments and
        buildings of that sort) that are not suitable for the installation of the mouhadjirs as well as
        the surplus buildings and other buildings left out of usage and mouhadjirs homes, shall be
        auctioned, according to article 18 by the Administrative Commission, where, under its
        control, through the means of an organism constituted by state employees and
        representatives of the Ministry of Finances "

Article 17        "The mouhadjirs reinstalled in the cities and districts shall be registered in a
        registrar for an official statistic  In those registrars will be consigned their names, the
        quality of the land given to them, their size and value "

Article 18        "In the event where we shall meet specialists capable of preserving and boosting
        the value of the vines, the gardens, the olive fields or similar real estate lands, close to the
        cities and villages, distribute to them under guarantee, according to their needs, abilities,
        as many estate goods and lands as necessary and deliver to the interested documents
        All real estate goods of this kind that kind that have not been given to the mouhadjirs
        shall be sold at public auctions, according to the article 16 "

Article 19        "Apart from the mouhadjirs that are in the districts or that came with a permit,
        with an authorization delivered by the local authorities, or by the Ministry of the Interior,
        it is necessary to require the official papers of those who wish to live like the mouhadjirs
        the Armenian cities and villages "

Article 20        "Those who wish to purchase houses or lands must take care of it, and if they
        fail their engagements or occasion damages, they must offer a guarantee to repair the
        damages; it is possible to give those lands and those houses for rent for a period not
        exceeding two years "

**Exhibit A**
**23**

Article 21    "Lists must be set up of all the buildings and lands acquired either by purchase or by rental, or by adjudication, of their quality, their size, their location, their purchase or rental price with detailed information of the clients and tenants."

Article 22    "The profits realized by the sale or rental of the properties shall be remitted into deposits to the Treasury of the Ministry of Finance, in the name of the owners and then shall be remitted to the owners according to ulterior regulations."

Article 23    "The remittance and the administrative arrangements of all the goods of the deported Armenians of cities and villages shall take place according to those rules. Those formalities are under the direct competence of the Administrative Commission on abandoned goods."

Article 24.   "These administrative commissions, for all that concerns the administrative arrangements of the abandoned goods refer solely and directly to the Ministry of the Interior and act according to the orders they receive and execute; they inform it to the local authorities."

Article 25.   "Will be formed as many commissions as necessary to execute the stipulations of these orders and after authorization of the Minister of the Interior, the designated state employees shall operate according to those directives.
Under the shield of the Ministry of the Interior, regulations and explanations shall be elaborated by the administrative commissions of abandoned goods and copies shall be sent to the Ministry of the Interior and to the local authorities."

Article 26    "It is the duty of the state employees of the administrative commissions on abandoned goods to do diverse formalities to house some mouhadjirs in the homes of the deported Armenians. To fasten those formalities must be designated inspectors in order to establish investigations and take, with consulting the local authorities, executory decisions. It is part of the attributes of the Administrative Commissions on abandoned goods."

Article 27    "The commissions were required to present, at least once every fifteen days, a brief report of their activities with their observations, their conclusions, their decisions to the Ministry of Interior and to the Government."

Article 28    "The Administrative Commissions on abandoned goods, during the exercise of their functions, shall abide to those orders and given rules."

Article 29    "The members of the Administrative Commissions on abandoned goods are jointly and severally liable during the time of their activities for the financial operations the administration and the preservation of the abandoned goods and lands."

Article 30    "The Administrative Commission on abandoned goods is composed of a president specially designated and of two members one of which is designated among the civil state employees of the city and the other, among the state employees of Finances (Ministry of Finance)."

Article 31    "The President of the Administrative Commission on abandoned goods or a person designated by him manages the correspondence in the name of the President."

Article 32    "The President of the Administrative Commission on abandoned goods can, if he judges it necessary, assign one of the member of the commission, according to these rules, to conduct an investigation or undergo a control or else he can grant him an executive power."

**Exhibit A**
**24**

<u>Article 33</u>.          "The President of the Administrative Commission on abandoned goods earns on a daily basis a pound and a half and the members, a pound, deducted on the sums affected to the mouhadjirs; they shall receive travelling expenses, if they go to other localities."

<u>Article 34</u>.          "In the districts where no commission is designated, the local central authority has the duty to designate somebody according to those instructions."

**Exhibit A**
**25**

# EXHIBIT B

10

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:        March 24, 1916

Code:        272.0.0.12

Place Code:  36.12.17

Informing the "Tasfiye Komisyon"s [Sale Commissions, dealing with the property belonging to those deported] that the Ziraat bank branches will provide lists and that work should be done commensurate to those lists provided by the bank branches.

10

[Page 1]

Ziraat bank has informed the General directorate of Tribes and Immigrants on February 4, 1916 (1331) that the Commissions will receive lists (of properties left behind by deportees) through the bank's branches, and that those lists should be used by the commissions in order to complete their work.

272-12-36-12-17

**Exhibit B**
**27**

**11**

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:          February 4, 1916

Code:          272.0.0 74

Place Code:    64.2.19

The sums deposited at the coffers of <u>Konya</u> from the sale of properties left behind by deportees had been transferred to Ziraat bank.

11

[Page 1]

Telegram sent by the Konya Commission dealing with the properties left behind by deportees. The sums deposited at the coffers Konya from the sale of properties left behind by deportees had been transferred to Ziraat bank.

272-74-64-2-19

12

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:          February 4, 1916

Code:          272.0.0.74

Place Code:    64.2.19

Regarding the sums deposited at the coffers **Bursa** from the sale of properties left behind by deportees had been transferred to Ziraat bank.

12

[Page 1]

Telegram sent by the **Bursa** Commission dealing with the properties left behind by deportees. The sums deposited at the coffers **Bursa** from the sale of properties left behind by deportees had been transferred to Ziraat bank.

272-14-64-2-16

13

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:            January 1, 1916

Code:            272.0.0.74

Place Code:      64 2 17

Regarding the sums deposited at the coffers **Afyon [Karahisar]** from the sale of properties left behind by deportees had been transferred to Ziraat bank.

**Exhibit B**
**32**

13

[Page 1]

Telegram sent by the **Afyon [Karahisar]** Commission dealing with the properties left behind by
deportees. The sums deposited at the coffers **Afyon [Karahisar]** from the sale of properties left behind
by deportees had been transferred to Ziraat bank.

272-74-64-2-17

Exhibit B
33

14

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:          January 1, 1916

Code:          272.0.0.74

Place Code:    64.2.15

Regarding the sums deposited at the coffers Sivrihisar from the sale of properties left behind by deportees had been transferred to Ziraat bank.

14

[Page 1]

Telegram sent by the <u>Sivrihisar</u> Commission dealing with the properties left behind by deportees. The sums deposited at the coffers <u>Sivrihisar</u> from the sale of properties left behind by deportees had been transferred to Ziraat bank.

272-74-64-2-15

**Exhibit B**
**35**

15

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:         January 29, 1916

Code:         272.0.0.74

Place Code:   64.2.13

Regarding the sums deposited at the coffers <u>Sivas</u> from the sale of properties left behind by deportees had been transferred to Ziraat bank.

**Exhibit B**
**36**

15

[Page 1]

Telegram sent by the <u>Sivas</u> Commission dealing with the properties left behind by deportees. The sums deposited at the coffers <u>Sivas</u> from the sale of properties left behind by deportees had been transferred to Ziraat bank

272-74-64-2-13

**Exhibit B**
**37**

16

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:           January 28, 1916

Code:           272.0.0.74

Place Code:     64.2.12

Regarding the sums deposited at the coffers <u>Yozgat</u> from the sale of properties left behind by deportees had been transferred to Ziraat bank.

16

[Page 1]

Telegram sent by the <u>Yozgat</u> Commission dealing with the properties left behind by deportees. The sums deposited at the coffers <u>Yozgat</u> from the sale of properties left behind by deportees had been transferred to Ziraat bank.

272-74-64-2-12

**Exhibit B**
**39**

17

DIRECTORATE OF OTTOMAN PRIME MINISTRY ARCHIVES

Date:            January 28, 1916

Code:            272.0.0.74

Place Code:      64.2.11

Regarding the sums deposited at the coffers izmit from the sale of properties left behind by deportees had been transferred to Ziraat bank.

17

[Page 1]

Telegram sent by the Izmit Commission dealing with the properties left behind by deportees. The sums deposited at the coffers Izmit from the sale of properties left behind by deportees until the end of 1331 (1916) had been transferred to Ziraat bank.

272-74-64-2-11

Exhibit B
41

19

Regarding the Coton [Circir] manufacturing facility which had been reverted to the ownership of Ziraat Bank in Adana, and not being assigned to private ownership as an establishment.

Republic of Turkey

Prime Ministry

Directorate of Dissemination of Decisions

Decision No.: 2/11873

DECISION

In a note written by the Ministry of Commerce, dated August 28, 1939, and bearing the serial number 4893/10627, the two Circir manufacturing facilities in [the city of] Adana, [the Ministry makes it clear that since the establishments [in question] being unable to pay what they owe and thus [their ownership] having been reverted to the above mentioned bank [Ziraat Bank, Adana Branch], and, furthermore, having been outside the purview of normal enterprises, and thus, having operated with loss, which makes the bank unable to deal with them, the bank had informed that it had sold one of the facilities and is in the process of selling the other [second]. The bank had informed the pertinent authorities about this. Since the second facility has not yet been sold, the bank informs that in accordance with article 26 of law number 3460, the establishment under question will cost a lot to bring it to an operating condition.

This issue has been meticulously discussed during the meeting of the Cabinet on September 4, 1939. The cabinet decided to consider the establishment in question to be exempt from the dictates of point 1 of article 26 of law number 3460, in accordance with and commensurate to the content of section 2 of the same law.

Signatures

**Exhibit B
42**

EXHIBIT C



**Exhibit C**
43



Exhibit D
44

# EXHIBIT E

Exhibit E
45



# EXHIBIT F

# GAZiANTEP CITY
www.gaziantepcity.info

## Hasan Süzer Ethnography Museum Photos

Previous - Next









**Exhibit F**
**47**

1/2

EXHIBIT G

*Talat ordering the selling of Armenia properties left behind + you do that "under the color of law"*

DH. SFR, 59/239
Bab ul Ali
Ministry of Interior
Directorate of Deportation and Tribal Relocation
General: # 813

Ciphered

To the Tasfiye Komisyon [Commissions of Clearance and Settlement] of:
Erzerum, Adana, Ankara, Bitlis Aleppo, Diyarbekir, Sivas, Trepizond, Maamuret
Al Aziz, Konya, and Edirne Vilayets [Provinces] and the Mutassarifates of: Urfa,
Janik, Karesi, Kayseri [Caesarea], [Shabin] Karahisar, Eskishehir, Nigde,
Kutahya, Marash, and the areas of Tekfurdagh, Adana, Jebel Bereket, Kozan [Sis],
Yozgat, Ankara, Erzerum, Bitlis, Aleppo, Marash, Antakia, Hudavendigar, Gemlik,
Bilejik, Diyarbekir, Sivas, Marzifon, Tokat, Samson, Ordu, Trepizond, Konya,
Maamuret Al Aziz, Izmit, Adabazar, Eskishehir, Sivrihisar, Kayseri, Develi, Nigde,
[Shabin] Karahisar, and Urfa.

It is ordered that special companies be formed for the real and temporal Armenian
properties left behind by the deportees in order to give their ownership to Muslims
under the color of law. These companies must remain in effect and their boards
must be elected from righteous and able citizens. Effort must be utilized so that the
shares of these companies will not b priced over one Turkish Lira, and that the
shares will not fall into the hands of foreign investors. We urge you to keep us
informed of all details regarding these actions.

November 24, 1915

Minister of Interior
[Talaat]
Signature

**Exhibit G**
48

**DH. ŞFR, 59/239**

Bâb-ı Âlî
Dâhiliye Nezâreti
İskân-ı Aşâyir ve Muhâcirîn Müdîriyeti
Umûm : 813

*Şifre*

*Erzurum, Adana, Ankara, Bitlis, Haleb, Hüdâvendigâr, Diyârbekir, Sivas, Trabzon, Ma'mûretülazîz, Konya, Edirne Vilâyetleriyle Urfa, İzmit, Canik, Karesi, Kayseri, Karahisâr-ı Sâhib, Eskişehir, Niğde, Kütahya, Mar'aş Mutasarrıflıklarına ve Tekfurdağı, Adana, Cebel-i Bereket, Kozan, Yozgat, Ankara, Erzurum, Bitlis, Haleb, Mar'aş, Antakya, Hüdâvendigâr, Gemlik, Bilecik, Diyârbekir, Sivas, Merzifon, Tokad, Samsun, Ordu, Trabzon, Konya, Ma'mûretülazîz, İzmit, Adapazarı, Eskişehir, Sivrihisâr, Kayseri, Develü, Niğde, Karahisâr-ı Sâhib, Urfa Tasfiye Komisyonları Riyâsetine*

Ermenilerden metrûk emvâl-i menkûlenin tûl müddet muhâfazasıyla ziyâ'dan vikâyesi ve memleketimizde İslâm mü'esseselerinin teksîri zımnında müslümanlardan mürekkeb olmak üzere şirketler teşkîliyle emvâl-i menkûlenin şerâ'it-i münâsebe ile kendilerine i'tâsı şirketlerin te'mîn-i bekâsı için şirket mü'essis ve hey'et-i idâresiyle mümessillerinin erbâb-ı nâmus ve iktidârdan intihâbına dikkat olunması hisse senedâtına esnâf ü zürrâ'dan iştirâk ettirilebilmek için senedlerin yarım veya bir liralık olmak üzere ihrâcı sermâyenin ecnebi ellere düşmemesi için nâma muharrer olması ve buna makîs şerâ'it-i sâ'irenin ittihâzıyla İslâm ahâli beyninde de hayat-ı ticâretin inkişâfına ihtimâm ve bu bâbdaki teşebbüsât ve netâyic-i icrâ'ât ve mu'âmelâtdan peyder pey nezârete de ma'lûmât i'tâ buyurulması.

Fî 24 Kânûn-ı Evvel, sene [1]331

*Dâhiliye Nâzır*
*İmza*

**Exhibit G**
**49**

Passeport d'Hagop Handjian portant la mention " Retour interdit ", délivré par la nouvelle République turque, le 19 juillet 1924, Centre du Patrimoine Arménien, à de Valence

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV13- 1401 SJO (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
| --- | --- | --- |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Kathryn L. Boyd, Esq.; Rajika L. Shah, Esq.;
Kristen L. Nelson, Esq.
SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd. Suite 360
Los Angeles, CA 90048
Telephone No. 323-302-9488

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Norman MANOOKIAN, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV 13-01401 SJO (S+x) |
| v. | |
| REPUBLIC OF TURKEY; CENTRAL BANK FOR THE REPUBLIC OF TURKEY; T.C. ZIRAAT BANKASI DOES 1-100, | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S):

    A lawsuit has been filed against you.

    Within __60 *__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, __Kathryn Lee Boyd_____, whose address is __SRBR, LLP 6310 San Vicente Blvd., Suite 360 Los Angeles, CA 90048_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

FEB 2 6 2013

Dated: _____

By: _____
    MARILYN DAVIS
    Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

* Pursuant to 28 U.S.C. Section 1608(d) of the Foreign Sovereign Immunities Act, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty (60) days after service has been made.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

MANOOKIAN, Norman

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

REPUBLIC OF TURKEY; CENTRAL BANK OF THE REPUBLIC OF TURKEY; T.C. ZIRAAT BANKASI

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
SCHWARCZ, RIMBERG, BOYD & RADER, LLP [6310 San Vicente Blvd., Suite 360 Los Angeles, CA 90048 Telephone No. 323-302-9488]
YEGHIAYAN LAW FIRM, P.C. [ 535 N. Brand Blvd., Suite 270 Glendale, CA 91203 Telephone No. 818-242-7400]

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** in excess of $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Sections 1604, 1605. Tort actions arising from unlawful expropriation of real property.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☒ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:  Case Number: CV13-01401

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ NO  ☒ YES

If yes, list case number(s):  Bakalian et al. v. Republic of Turkey et al. Case No. 2:10-cv-09596-DMG(SSx)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | MANOOKIAN, Norman (Tennessee) |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | REPUBLIC OF TURKEY (Republic of Turkey); CENTRAL BANK OF THE REPUBLIC OF TURKEY (Republic of Turkey); T.C. ZIRAAT BANKASI (Republic of Turkey) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Republic of Turkey for all claims |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**  _____  DATE:  2/25/13

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |